***E-Filed 09/09/2010***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br>　v.<br><br>$35,017 IN UNITED STATES CURRENCY,<br><br>　　　　Defendant._____/ | No. C 10-0995 RS<br><br>**ORDER GRANTING MOTION TO VACATE CLERK'S ENTRY OF DEFAULT** |

## I. INTRODUCTION

The Lang family asks the Court to vacate the Clerk's entry of default. This Court requested further briefing from the parties regarding the impact of a recent Ninth Circuit Opinion, CITE. The parties original and supplemental papers were submitted without oral argument, pursuant to Local Civil Rule 7-1(b). Having considered the papers and consistent with the fact that default judgment is a drastic remedy, the Langs' motion to set aside the entry of default shall be granted.

## II. FACTUAL BACKGROUND

David Michael Lang lives with his parents, Diane and Keith Lang. The family resides at 36 Rancho Drive in San Jose, California. In the midst of executing a warrant to search David Michael's bedroom, law enforcement officers seized 37.4 grams of methamphetamine, 91

hydrocodone pills, three hand guns, two rifles, matching ammunition and a functioning video surveillance monitor.  The officers also seized $35,017 in cash from that bedroom: $34,968 stored in a safe and $49 in David Michael's wallet.  The $35,017 is the "defendant" in the underlying civil forfeiture action.  As the government explains, the sum is subject to forfeiture as "funds intended to be furnished in exchange for illegal drugs or traceable to proceeds from such an exchange in violation of 21 U.S.C § 881(a)(6)."  (Pl.'s Opp'n at 1:16-18.)  The criminal charges brought against David Michael Lang were ultimately dropped sometime in the Spring of 2010.

On November 12, 2009, the Drug Enforcement Agency (the "DEA") mailed a notice addressed to David Michael Lang and directed to the Rancho Drive address.  That notice explained how Lang could contest the seizure and forfeiture of the seized $35,017.  On November 28, 2009, David Michael Lang and his father, Keith Lang, signed and sent to the DEA Forfeiture Counsel a verified claim asserting under oath that they owned the cash.  Specifically, David Michael does not assert an interest in the funds from the safe; it is only the $49 found in his wallet that he claims.  Diane Lang, David Michael's mother and Keith's wife, did not at that time assert her ownership interest to the DEA.  The DEA then referred the seizure claim to the United States Attorney's Office for the filing of a judicial foreclosure suit.

The United States filed the instant civil forfeiture action on March 9, 2009, and directed notice to the parties known to have an interest in the claim.  Specifically, the United States sent a packet of documents (including a copy of the verified complaint for forfeiture) to the Rancho Drive address via certified mail.  Crucial to this action is the "Notice of Forfeiture" that was included in that packet of documents.  The notice stated that in order to contest the forfeiture, a claimant would need to file a verified claim in district court within 35 days, and an answer to the complaint within 20 days of filing the verified claim.  The United States received certified mail receipts for the documents which Bryan Lang (apparently another family member who resided at the Rancho Drive address) signed on March 11, 2009.  David Michael, Keith, and Diane Lang do not dispute that they received the notice and admit that they did not timely file a verified claim.

No. C 10-0995 RS
Order

On May 28, 2010, the United States filed a request that the Clerk enter default. The government duly served this request on the Langs. On June 2, 2010, the Clerk entered default. Assistant United States Attorney Patricia Kenney states that Diane Lang telephoned her office on May 28, 2010. In that conversation, Lang asserted that the cash from the safe largely belonged to her. She characterized the money as part of her inheritance and assured AUSA Kenney that its intended use was for her family's livelihood and, one day, to finance the wedding ceremonies of her children. Lang explained that she received notice of the request to enter default as well as the original March 10 notice (explaining the need to file a verified claim), but felt confused. Lang said she assumed she could assert her interest in the money by appearing at the scheduled Case Management Conference. Kenney explained that the Langs should have filed a claim as explained in the Notice of Forfeiture, but suggested she apply for a "good cause" extension of the deadlines. Kenney also told Lang she should consider hiring an attorney. Apparently, the Langs sent a letter directly to a judge previously assigned to this action. In that letter, dated May 31, 2010, they requested an extension of time to file a verified claim asserting their interest in the $35,017. This letter was not filed electronically and was not directed to this Court until July 15, 2010. It was added to the electronic docket that day.

Kenney explains that she was contacted on June 9, 2010 by an attorney who was considering representing the Langs. They briefly discussed the case. On June 11, the same attorney called Kenney once more, told her he had decided not to take the case, and explained that he directed the Langs to another local attorney. On June 16, the United States filed its motion for default judgment and, on July 1, 2010, the Langs (with the assistance of their new attorney), filed their request for relief from the entry of default.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure provide that a "court may set aside an entry of default for good cause . . . ." Fed. R. Civ. Pro. 55(c). To determine "good cause," a court must "consider[ ] three factors: (1) whether [the party seeking to set aside the default] engaged in culpable conduct that led to the default; (2) whether [it] had [no] meritorious defense; or (3) whether reopening the

NO. C 10-0995 RS
ORDER

3

1  default judgment would prejudice" the other party.  *See Franchise Holding II v. Huntington Rests.*
2  *Group, Inc.*, 375 F.3d 922, 925-26 (9th Cir. 2004).  This standard, which is the same as is used to
3  determine whether a default judgment should be set aside under Rule 60(b), is written in the
4  disjunctive, such that finding any one of these factors to be true is sufficient reason for the district
5  court to refuse to set aside the default.  *See id.*

6  Crucially, however, "judgment by default is a drastic step appropriate only in extreme
7  circumstances; a case should, whenever possible, be decided on the merits."  *Falk v. Allen*, 739 F.2d
8  461, 463 (9th Cir. 1984); *see also Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1103
9  (9th Cir. 2006); *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 695-96 (9th Cir. 2001).  The
10 Ninth Circuit recently emphasized that the "rules for determining when a default should be set aside
11 are solicitous towards movants, especially those whose actions leading to the default were taken
12 without the benefit of legal representation."  *U.S. v. Signed Personal Check No. 730 Of Yurban S.*
13 *Mesle*, No. 09-55353, 2010 WL 3025014, at *1 (9th Cir. Aug. 04, 2010).  *See also TCI Group*, 244
14 F.3d at 695-98.

15                                    IV.  DISCUSSION
16      1. <u>Culpable Conduct</u>

17 For the last several years, courts in this circuit have split as to what standard governs the
18 culpability inquiry.  One view holds that, if there is receipt of actual or constructive notice of the
19 filing of an action and a defendant fails to answer, then this is, by itself, indicative of culpability.
20 *See, e.g.*, *Franchise Holdings II*, 375 F.3d at 926.  Under this view, the Lang's failure to file a claim
21 and an answer would end the inquiry and provide an appropriate basis upon which to deny their
22 motion.

23 A second line of Ninth Circuit cases, however, provides that, "a defendant's conduct is
24 culpable if he has received actual or constructive notice of the filing of the action and *intentionally*
25 failed to answer."  *TCI Group*, 244 F.3d at 697 (emphasis in original) (*quoting Alan Neuman Prods.,*

*Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988)).[1]  In this context, the term "intentionally" means that a movant cannot be treated as culpable "simply for having made a conscious choice not to answer; rather, to treat a failure to answer as culpable, the movant must have acted with bad faith." *Mesle*, 2010 WL 3025014, at *4 (*quoting TCI Group*, 244 F.3d at 697).  Bad faith, moreover, can be discerned from an attempt to "take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process." *Id.* (citation omitted).

Several weeks ago in *Mesle*, the Ninth Circuit clarified that the more stringent *Franchise Holdings* approach does not represent "the ordinary standard for Rule 55(c) and 60(b) motions." *Mesle*, 2010 WL 3025014, at *4.  "[I]n fact," the Court pointed out, "we have never applied it to deny relief in the context of such motions except when the moving party is a legally sophisticated entity or individual." *Id.* (*citing Franchise Holdings II*, 375 F.3d at 924 (notice of action received by counsel of company that later tried to set aside the default); *Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*, 840 F.2d 685, 690 (9th Cir. 1988)).  "It is possible," the Court continued, "to reconcile the language in *Franchise Holdings II* with the standard in *TCI Group*." *Id.*  "When considering a legally sophisticated party's culpability in a default, an understanding of the consequences of its actions may be assumed, and with it, intentionality." *Id.* (*citing Direct Mail Specialists, Inc.*, 840 F.2d at 690 (defendant was "a lawyer, presumably . . . well aware of the dangers of ignoring service of process")).  Recognizing that the party in *Mesle* was "not a lawyer and that he was unrepresented at the time of the default," the Court concluded that the proper standard to apply was that articulated in *TCI Group*. *Id.*

---

[1] Under the *TCI Group* view, the Ninth Circuit has "typically held that a defendant's conduct was culpable for purposes of the [good cause] factors where there is no explanation of the default inconsistent with a devious, deliberate, willful, or bad faith failure to respond." *Id.* at 698.  The *TCI Group* Court relied on the Supreme Court's approach in *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380, 388, 394-95 (1993).  *TCI Group* read that case as a clear indication that simple carelessness is not sufficient to treat a negligent failure to reply as inexcusable, at least without a demonstration that other equitable factors, like prejudice, favor denial of the motion to set aside default.  *See TCI Group*, 244 F.3d at 696-97.  *See also Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009).

NO. C 10-0995 RS
ORDER

It is not disputed here that the Langs, non-attorneys, were not represented at the time the Clerk entered default. Diane and Keith Lang aver that they have never been involved in either criminal or civil litigation. As in *Mesle*, the *TCI Group* "intentional culpability" framework should apply here. Diane Lang emphasized (both to Kenney and in Lang's declaration) that she and her family members are legally unsophisticated and were confused as to what, exactly, they needed to do to assert their interest. They claim they thought the Case Management Conference was the appropriate venue to air all claims.[2] Presumably, the Langs might have even mistakenly believed that they had *already* asserted an interest by responding to the DEA notice. Moreover, it is also apparent that they contacted both the Court (although the attempt was unfortunately unsuccessful) and Kenney prior to entry of default. In both cases, the Langs expressed their wish to participate in the litigation and asked only to be given a small amount of time to obtain counsel.[3]

As the United States points out, the Langs do not explain why they did not seek counsel immediately in March of 2010, when they would have had ample time to file a verified claim and an answer within the requisite period. Yet, this delay does not reveal any "intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process" as contemplated by *TCI Group*. 244 F.3d at 697. It is not obvious how it could. To the contrary, the Lang's failure to respond allowed them neither to "take advantage" of the federal government, nor to "manipulate the legal process." The only outcome that delay could have earned

---

[2] The United States does not disagree that *TCI Group* supplies the appropriate standard. It insists instead that Langs have not offered a suitable explanation for why they waited or hesitated to find counsel. The Langs explain that they erroneously believed they could assert their interest at the scheduled Case Management Conference which did not take place in light of the reassignment of this action. The United States in turn supplies an explanation it asserts is more plausible: the timing of their recent interest is consistent with a theory that the Langs waited to claim their interest in the currency until after the criminal case against their son, David Michael, was dropped.
Even assuming this is true, however, it is still not clear how or why the Lang's delay placed them at an advantage or manipulated the legal process. Instead, it may reflect a "conscious choice not to answer," driven perhaps by a lack of familiarity with the legal system, but it does not rise to the level of bad faith contemplated in *TCI Group* or *Mesle*.

[3] While the United States does argue that, even under the *TCI Group* standard, the claimants were "culpable," the cases they cite for support all acknowledge substantial attorney involvement in each claimant's case.

NO. C 10-0995 RS
ORDER

6

them was what they received: a default and a heightened possibility of the loss of property, which was already in the hands of the government and which the Langs had no hope of reacquiring except by engaging in the legal process. *See Mesle*, 2010 WL 3025014, at *5 ("[C]ulpab[ity] usually involves conduct by parties that is calculated to help them retain property in their possession, and avoid liability by staying out of court: for instance, when companies act to avoid service in order to thwart their customers' attempts to bring suit against them.").[4]

2. Meritorious Defense

"A defendant seeking to vacate a default judgment must present specific facts that would constitute a defense. But the burden on a party seeking to vacate a default judgment is not extraordinarily heavy." *TCI Group*, 244 F.3d at 700 (citations omitted). All that is necessary to satisfy the "meritorious defense" requirement is to allege sufficient facts that, if true, would constitute a defense: "the question whether the factual allegation [i]s true" is not to be determined by the court when it decides the motion to set aside the default. *Id.*

Defendants deny that either the cash in the safe or in David Michael's wallet was related to the seized drugs. Instead, Diane and Keith Lang assert that the funds found in the safe belong to them. Specifically, Diane states that she inherited some percentage of the cash. She submits evidence of cash disbursements from a revocable trust, in the amount of $60,000 in 2004 and $20,000 in 2002. Some of these funds, she insists, were kept in the safe. The Langs explain that they both deposited funds from time to time whenever they felt a "bit ahead." The United States argues that the Lang's explanation simply cannot be believed, especially as the safe was housed in David Michael's bedroom in close proximity not merely to contraband but also to weapons and a home security system. The Langs have an explanation. Some years ago, intruders burglarized their home and fired gunshots into David Michael's bedroom. In response, the Langs claim they installed the security system, purchased weapons for protection (all of which, they point out, are registered

---

[4] Crucially, too, the delay here constituted little more than one month between the missed deadline and the Lang's letter requesting an extension so that they might retain counsel. The Government does not even argue the delay resulted in any prejudice.

NO. C 10-0995 RS
ORDER

with the state of California), and installed a safe to guard valuables. To corroborate the story, they also submit police reports documenting the break-in and shooting. The Court cannot determine the truth of the Lang's defense at this juncture. Instead, the standard asks whether, *if* true, the explanation would constitute a legal defense. Certainly, it would.

3. Prejudice

"To be prejudicial, the setting aside of a judgment must result in greater harm than simply delaying resolution of the case." *TCI Group*, 244 F.3d at 701. The United States does not argue that it would be prejudiced by setting aside the default and resolving the case on its merits. This factor plainly favors granting the motion to vacate the entry of default

## III. CONCLUSION

The three factors in the "good cause" analysis for setting aside a default under Rule 55(c) favor the Langs. Especially in light of the Ninth Circuit's emphasis that "judgment by default is a drastic step appropriate only in extreme circumstances [and] a case should, whenever possible, be decided on the merits," *Falk*, 739 F.2d at 463, the equities support vacating the Clerk's entry of default. Accordingly, the Langs shall have 35 days from the entry of this Order to comply with the March 9, 2010 Notice. A Case Management Conference shall be held on November 4, 2010 at 10:00 a.m. in Courtroom 3 on the 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California. The parties shall submit a Joint Case Management Statement at least one week prior to the Conference.

IT IS SO ORDERED.

Dated: 09/09/2010

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

No. C 10-0995 RS
ORDER